# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
January 14, 2015 Session

## JAMES R. CRANMER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 41100425    Michael R. Jones, Judge**

_____

**No. M2013-02866-CCA-R3-PC - Filed April 23, 2015**

_____

In 2011, the Petitioner, James R. Cranmer, pleaded guilty to one count of second degree murder, one count of attempted second degree murder, and two counts of reckless aggravated assault. The trial court sentenced him to an effective sentence of fifteen years in the Tennessee Department of Correction. The Petitioner filed a petition for post-conviction relief, alleging that he received the ineffective assistance of counsel, and the post-conviction court held an evidentiary hearing after which it denied the petition. On appeal, the Petitioner contends that the post-conviction court erred when it denied his post-conviction petition because he received the ineffective assistance of counsel at trial, and he further contends that his guilty plea was not voluntary, knowing, or intelligent because the State committed a *Brady* violation. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Margaret Garner, Clarksville, Tennessee, for the appellant, James R. Cranmer.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; John W. Carney, Jr., District Attorney General; and C. Daniel Brollier, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts
#### A. Background and Guilty Plea

This case arises from a shooting that occurred at Flavors After Hours Club in Clarksville, Tennessee, on February 6, 2011. Based on the Petitioner's involvement in this event, a Montgomery County grand jury indicted the Petitioner for one count of second degree murder, one count of attempted second degree murder, one count of unlawful employment of a firearm during the commission of a dangerous felony, and four counts of aggravated assault. The Petitioner entered guilty pleas to one count of second degree murder, one count of attempted second degree murder, and two counts of reckless aggravated assault. The remaining charges were dismissed.

During the guilty plea hearing, the State announced the factual basis underlying the guilty pleas as follows:

> [T]he facts of this case are that on the morning of February 6, 2011, the [Petitioner] and a number of individuals were at the Flavors (phonetic) After Hours Club in Clarksville, Montgomery County. The [Petitioner] and a Mr. Lionel Watkins, who is the victim in Count two, got into an argument. The [Petitioner] challenged Mr. Watkins and Mr. Watkins struck the [Petitioner]. After being struck, the [Petitioner] pulled a gun and started shooting and shot and killed Detwain Bell (phonetic), struck Mr. [Bell] right in the chest and he died extremely quickly from those injuries. The [Petitioner] continued to fire, struck Mr. Watkins twice, once in the hand and once in the back. Mr. Watkins suffered some very serious injuries, life-threatening injuries and still has on-going problems from those. He also struck Ms. Jaquita Murray (phonetic) in the leg and Ms. Jamaine Thompson (phonetic) in the leg. There were numerous witnesses at the club, [there] was over a hundred people in there. Several [witnesses] have identified the [Petitioner] as the individual that was shooting and that fled from the scene and . . . later we found him, actually using ping tracing to locate him and found him up in Kentucky hiding from the police three days after the shooting occurred.

Based upon this evidence, the trial court accepted the Petitioner's guilty pleas. The trial court sentenced the Petitioner to fifteen years for his second degree murder conviction, twelve years for his attempted second degree murder conviction, and four years for each of his reckless aggravated assault convictions. The trial court ordered that all the sentences run concurrently, for a total effective sentence of fifteen years in the Tennessee Department of Corrections.

**B. Post-Conviction Hearing**

2

The Petitioner filed a petition for post-conviction relief in which he alleged multiple grounds for relief, particularly that he had received the ineffective assistance of counsel because his trial attorney, ("Counsel"), provided him "grossly" inaccurate advice regarding his plea agreement offer from the State, failed to adequately investigate the case or prepare for trial, and failed to take actions necessary to allow the Petitioner to withdraw his guilty plea when given the option by the State. The Petitioner also contended that Counsel had failed to interview witnesses, including the victims, and that Counsel provided him incorrect information regarding his plea offer and failed to communicate that the State had offered the Petitioner the option to withdraw his plea. The Petitioner further argued that Counsel failed to review discovery with him, failed to adequately prepare for trial, and failed to file any pre-trial motions.

On January 10, 2013, the post-conviction court held a hearing on the petition for post-conviction relief, during which the following evidence was presented: Jaquita Murray testified that she was present at "the club known as Flavors" on February 6, 2011. She agreed that she was inside the club when Detwain Bell was shot. She testified that she was also shot. Ms. Murray agreed that she gave a statement to Detective Tim Anderson about the shooting and told him that there had been two shooters. Ms. Murray stated that she described the two shooters to Detective Anderson and said that one was wearing a black hoodie and one was wearing a light blue hoodie. She said that the Petitioner was wearing the black hoodie.

Ms. Murray stated that she wrote a statement for the Petitioner's initial lawyer on February 15, 2011. She agreed that in that statement she said that it was not the Petitioner who shot her. She agreed that she was subpoenaed by both the State and the defense for the Petitioner's trial. Ms. Murray denied telling the Petitioner's mother that the Petitioner did not shoot her.

On cross-examination, Ms. Murray reiterated that she was subpoenaed to the Petitioner's trial and was prepared to testify. She agreed that in her interview with police about the shooting she described one shooter as "dark skinned" and the second shooter as "light skinned[.]" Ms. Murray stated that she had seen the Petitioner earlier in the evening wearing a black hoodie with the word "Loyalty" written on it, and then she saw him again later at the Flavors club wearing the same clothing. Ms. Murray stated that she did not actually see who shot her.

Ms. Murray testified that when she was in the ambulance on the way to the hospital, she received a telephone call on her cell phone threatening her not to say anything about what had occurred inside the club. She said that was why she later told the detective that she was unsure about who shot her. Ms. Murray stated that her statement that the Petitioner did not

shoot her was false and that, in fact, the Petitioner was the man who shot her. She gave the false statement to the Petitioner's lawyer "because of the threats." Ms. Murray stated that she spoke with Counsel one time about the Petitioner's case and told Counsel that she "didn't feel like talking to [Counsel] . . . ."

Counsel testified that she represented the Petitioner on multiple criminal charges and was appointed to represent him in June of 2011. Counsel stated that she had been licensed for thirteen years and was also licensed to practice in Florida and Alabama. She testified that her practice consisted of criminal matters, divorce cases, and personal injury cases. Counsel stated that she had participated in two jury trials.

Counsel testified that she was appointed to represent the Petitioner at a bond hearing, and she represented him at his subsequent arraignment. Counsel recalled that the State provided her with discovery and that she reviewed it shortly after the Petitioner's arraignment. Counsel stated that the Petitioner was charged with six counts related to five victims, one of whom was deceased. After reviewing the discovery, Counsel's initial impression of the Petitioner's case was that he "had a shot" at being acquitted because of the number of conflicting witness statements. Counsel told the Petitioner right away that she thought he had a chance at being acquitted but that he might still be convicted.

Counsel testified that she discussed the discovery materials with the Petitioner and met with him and his mother and grandmother. She stated that she went over the lesser-included offenses with the Petitioner and the range of punishment for each charge. Counsel recalled that the Petitioner "wanted [the State] to offer him [a plea deal for] manslaughter," but the State was not agreeable. Counsel stated that she put a lot of time into the Petitioner's case and was "one hundred percent" comfortable with her representation of him. She stated that witnesses were reluctant to talk with her and that she had a hard time making contact with some of the witnesses, as well as some of the victims. Counsel stated that she attempted to contact Mr. Watkins and Ms. Murray, whom she considered a "vital" witness to the Petitioner's claim that he was not the shooter. Counsel testified that she tried to contact Ms. Murray on multiple occasions and had her served with a subpoena. Ms. Murray sent a message through the server that she would not talk to Counsel. Counsel stated that Ms. Murray's story about the shooting had changed over time.

Counsel testified that she filed a motion to have the Petitioner's preliminary hearing transcribed. She stated that the discovery materials contained many inconsistent and contradictory statements about the shooting. She agreed that the discovery materials contained a photographic lineup that indicated that Ms. Murray had been unable to identify the shooter. Counsel stated that Ms. Murray was "a good witness" for the Petitioner. Counsel stated that Ms. Murray's statement to the Petitioner's initial lawyer was not

4

contained in discovery. Counsel stated that the photographic lineup shown to the other victims, Jermaine Thompson and Michael Taylor, was also in discovery. She recalled that neither of the men could identify the shooter from the lineup.

Counsel agreed that based on the discovery materials she received, "not one victim" could identify the Petitioner as the shooter. Counsel reiterated that the State provided discovery to her consistent with its "open file policy," and, thus, she did not file a motion for discovery. Counsel testified that she did not receive all the discovery materials at first, including medical records and ballistics reports, but those documents were later made available to her.

Counsel agreed that one witness statement indicated that the Petitioner and one of the victims were arguing inside the club. Counsel stated that, in her opinion, that was not helpful for a potential manslaughter or a self-defense theory because the Petitioner's position was that he was not the shooter and that was the defense he "wanted presented." Counsel stated:

> I did not believe that there was a manslaughter [theory] when [the Petitioner] claimed he did not do it. As far as in the heat of passion, if he'd have been in the middle of a fight and he had killed somebody, we could have argued for that. But [the Petitioner] didn't want to argue that. He didn't want to argue anything except I did not do it.

Counsel stated that one witness said that another person in the club had a weapon. She recalled that Ms. Murray said that the "light skinned guy" had a gun and then the "other guy" pulled out a gun, which was where the two shooter theory came from. Counsel recalled that one of the club's dancers said she saw the Petitioner with a gun, and another witness said he had his hands in his pocket. Counsel stated: "There were people who said there was a fight going on, there were people who said nothing was going [on], there were people that said the music was loud and shots rang out, . . . there were many, many, many statements."

Counsel reviewed a statement given by Sergeant Farrer, who arrived on the scene and found a black male handcuffed at the front door of the club with tasers in his upper body. She agreed that the man was found to be in possession of drugs and arrested. Counsel did not conduct further investigation on the man. Counsel agreed that a holstered handgun had been found in a trash can by crime scene investigators. Counsel stated that the weapon belonged to an off-duty Nashville police officer and recalled that the officer was working at the club as a cook. Counsel stated she did not interview the off-duty officer. Counsel agreed that witnesses and club security guards made statements about multiple weapons being inside the club. She stated that she interviewed the security guards, and they said that the Petitioner was not searched for weapons before he entered the club.

5

Counsel stated that, during her representation of the Petitioner, she was asked to leave the firm where she was employed. She agreed that the case was continued twice, and, on the third trial date, the Petitioner entered his guilty plea. In terms of preparing for trial, Counsel stated that her typical process was to become "completely familiar" with the case, decide on the defense theory, and then decide how to proceed at trial. She stated that she spent "all the time that's necessary to prepare for a case whether it's a DUI or a murder."

Counsel agreed that she first asked to see and viewed the discovery in the case two weeks before the third trial date. Counsel stated that she told the Petitioner's family that, if he did not plead guilty, he could be sentenced to fifty-one years. She recalled that the Petitioner was very upset about that possibility. She agreed that her statement to the Petitioner's family was not an accurate statement of his sentencing possibilities and that she later discussed with him his actual sentencing possibilities. Counsel stated that she discussed with the Petitioner and his family consecutive sentencing and the possibility of the trial court ordering consecutive sentences in his case.

Counsel testified that she was ready for trial "at any time." She agreed that she contacted her ex-employer one week before the third trial date asking for copies of her file related to this case. Counsel testified that the Petitioner's grandmother contacted her and asked about the possibility of the Petitioner taking a polygraph test. She agreed that she advised the Petitioner's family that the results of the test would not be admissible in court but that if the Petitioner passed the test the prosecutor might take it into consideration. Counsel advised the Petitioner not to discuss the polygraph test. Counsel testified that the prosecutor learned of the polygraph test taken by the Petitioner through a recorded phone conversation at the jail.

Counsel agreed that she made an effort the day before the Petitioner entered his guilty plea to negotiate a best interest plea. She believed he was innocent and so did not want him to plead guilty. The Petitioner's guilty plea was entered on Monday, March 26, 2012, and Counsel testified that the terms of the plea agreement were discussed over the weekend prior. She recalled that on Friday, March 23, 2012, the Petitioner told her that he was not going to plead guilty. She stated that she had information from the State that the Petitioner's phone calls from jail had been listened to and that he had discussed their defense strategy and made a phone call attempting to coerce a witness. Counsel denied advising the Petitioner to use another inmate's pin number to make jailhouse calls.

Counsel testified that she had trouble locating witnesses to interview in preparation for trial and that she made attempts to contact Ms. Murray. She agreed that the State issued multiple subpoenas to the witnesses as early as January 2012. She agreed that the State's list of witnesses and their address information was a matter of public record that she could have

6

obtained from the clerk's office. Counsel stated that she eventually spoke to Ms. Murray on two occasions, one of which was during a meeting with the Petitioner's mother.

Counsel testified that, after the Petitioner entered his guilty plea, she was in communication with the State about the Petitioner withdrawing the plea. Counsel agreed that on March 28, 2012, two days after the Petitioner entered his guilty plea, she learned from the State that the club's security guard, Mr. Galbreath, had made a statement that the shooter was not a white male but was "light skinned." Because that created some doubt about the Petitioner's role in the shooting, the State offered to give the Petitioner thirty days to withdraw his plea. Counsel stated that she communicated this information to the Petitioner on April 4 or 5, 2012. Counsel stated that she attempted to contact Mr. Galbreath, as well as Ms. Murray again, to attempt to get more information about the incident for the Petitioner. Counsel's investigation and conversations with the State continued through the middle of April, during which time the Petitioner communicated ambivalence about whether to withdraw his plea. Counsel said he was concerned about the witnesses, Ms. Murray and Mr. Galbreath, and wanted to know if the new information from Mr. Galbreath might benefit the Petitioner's case. Counsel advised the Petitioner that she did not think what Mr. Galbreath said would "hurt [the Petitioner's] chances and or help[] his chances in any way . . . ." Counsel stated that the Petitioner eventually signed a document stating that he did not want to withdraw his plea. Counsel clarified that the document read: "I do or do not want her to file a motion to withdraw my plea," and the Petitioner circled, "do not."

Counsel testified that she left town after the Petitioner made his decision not to withdraw his plea. The Petitioner seemed unsure about his decision and wanted to talk it over with his family. Before leaving town, Counsel advised the Petitioner of her out of town trip. She explained to him that she would be available by phone but could not visit him again at the jail to discuss his decision. While Counsel was out of town, the Petitioner's mother called her and said that the Petitioner did not want to withdraw his plea. Upon Counsel's return, she sent a follow-up letter to the Petitioner to close her file and received a letter from the Petitioner in response stating that he wanted to withdraw his plea. Counsel visited the Petitioner in jail to discuss the letter he sent to her and again he signed a document stating that he did not wish to withdraw his plea. Counsel told the Petitioner that she could try to contact the State about withdrawing his plea outside the thirty-day period.

Counsel testified that if she had incorrectly relied on the Petitioner's mother in her thinking that the Petitioner did not want to withdraw his plea, she would have gone to the trial court and the State and said the same. However, the Petitioner continued to state that he did not want to withdraw his plea. He also never indicated that he wanted to hire another attorney even though Counsel advised him that he could retain a different attorney.

Counsel testified that she discussed the Petitioner's charges and possible sentences with him, as well as the lesser-included offenses, even though she did not have letters or other notes documenting those discussions.

Regarding the Petitioner's plea negotiations, Counsel agreed that on Friday, March 23, 2012, there was still a chance that the Petitioner's case would go to trial. Counsel testified that she spent a "great deal of time," more than five hours, preparing for trial over that weekend.

On cross-examination, Counsel confirmed that she did not disclose the results of the polygraph test to the State. She agreed that the State learned about the polygraph test by listening to the Petitioner's recorded jailhouse telephone calls. Counsel stated that her trial strategy was to highlight the many inconsistencies and contradictions in the eye witnesses' accounts. She agreed that there were 75 to 100 people present inside the club when the shooting occurred and that there were multiple statements taken by the police with some identifying the Petitioner as the shooter. She stated that some witnesses gave statements specifically stating that the Petitioner was not the shooter, including Ms. Murray. Based on that, Counsel believed that she could establish a reasonable doubt with the jury. Counsel testified that she watched "hours and hours" of video recorded witness interviews.

Counsel testified that the Petitioner insisted he was innocent of the crime up until the day he took the plea deal. Counsel stated that the Petitioner's mother convinced him to plead guilty. The Petitioner wanted to go to trial and had confidence in Counsel's representation at trial. He was most concerned about the number of years he would be sentenced to, and he eventually agreed to a plea deal with a fifteen-year sentence, the minimum for second degree murder.

Counsel testified that she had trouble contacting witnesses and was not able to interview many of them herself. She agreed that she did not subpoena any witnesses for trial other than Ms. Murray because she knew that, based on her dealings with the assistant district attorney assigned to the case, the witnesses for the State would not be released from their subpoena without her being notified.

Patty Cranmer, the Petitioner's mother, testified that she met Counsel in August 2011 at a court hearing. She stated that she had conversations with Counsel about the Petitioner's case prior to his trial date in March 2012. Ms. Cranmer stated that she met with Counsel in person in February 2012, and Counsel expressed her difficulty in locating witnesses. Counsel explained to Ms. Cranmer that if the Petitioner did not take the plea offered by the State he could be sentenced to fifty-one years incarceration. Counsel made this statement several times. Based on Ms. Cranmer's concern about the lengthy sentence, she advised the

8

Petitioner to accept the State's offer for a plea agreement.

Ms. Cranmer agreed that Counsel contacted her after the Petitioner entered his guilty plea and told her the State had offered to allow the Petitioner to withdraw the plea due to exculpatory evidence that the State had not provided the Petitioner. Ms. Cranmer said that she told Counsel that her son wanted to withdraw the guilty plea and that she wanted to meet with Counsel, who was out of town at the time.

The Petitioner testified that Counsel was appointed to represent him at his bond hearing. He agreed that he was charged with multiple felonies, including second degree murder. He stated that Counsel never reviewed each of the charges or the possible sentences for each charge with him. He stated that when he asked Counsel to "explain the whole situation to [him]," she responded that she wanted to wait until thirty days before his trial to have that discussion. The Petitioner denied that Counsel reviewed lesser-included offenses with him or possible defenses to the charges. He said they never discussed what witnesses she would call to testify. He agreed that Counsel provided him with discovery.

The Petitioner testified that he made handwritten notes during his review of the discovery and sent those notes to Counsel. He wanted to discuss his notes with her, but she told him they would have that discussion within the thirty days before trial. Counsel told him that she did not want to know his view of the case until she had time to formulate her own theories. He agreed that his case was set for trial three different times, and he stated that they never reviewed discovery together. The Petitioner stated that he was never able to view the video recorded statements of the witnesses included in the discovery and that he asked for the medical examiner's report and did not receive that either. He later was able to view the examiner's report when he hired a new attorney after entering the guilty plea.

The Petitioner testified that before his first trial date, Counsel explained to him that she had to go out of town for her son's wedding. Counsel offered to have another attorney from her firm stand in but the Petitioner was not comfortable with that, as it was three weeks before the trial date. He stated that Counsel did not communicate with him often, and he had to rely on his mother to be his primary communicator with Counsel. He said it was Counsel's idea that he take the polygraph test and his mom paid for it. He said that Counsel gave him a choice, which was to either take the fifteen-year sentence and plead guilty or go to trial and possibly be sentenced to fifty-one years.

The Petitioner stated that he would not have pleaded guilty had he known "the truth" about the time he was facing. He signed the plea petition on Friday, March 23, 2012, but felt that he was making a "big mistake." He had discussed a best interest plea with Counsel, and she advised him that she was discussing the possibility with the State. He said that

9

Counsel did not communicate with him during the weekend before his plea and that it was during the plea hearing that he learned the State had not offered a best interest plea. He said that during the hearing she wrote a note to him that read, "it's 15 or 51." The Petitioner stated that he took the deal because Counsel told him he didn't have a defense and he would be sentenced to serve fifty-one years if he went to trial.

The Petitioner recalled that after he entered his plea, he learned from Counsel that the State had "unintentionally withheld some evidence" and that the State had offered to allow the Petitioner to withdraw his plea. Counsel advised him to "be careful" about withdrawing his plea because it was possibly a ploy by the State to have a trial resulting in a lengthier sentence. The Petitioner recalled that he had discussions and communication with Counsel about his decision but denied telling her that he did not want to withdraw his plea. He said that Counsel gave him a document to sign stating that he did not want to withdraw his plea, and he refused to sign it. He clarified that he signed a document stating that he did not want Counsel to withdraw his plea because he planned to hire another attorney.

The Petitioner testified that he felt as if Counsel did not advocate effectively on his behalf and that she had no intention of proceeding to trial. He stated that Counsel did not educate him on the trial process or prepare him to testify. He stated that he would not have entered the guilty plea if he had known that he was not facing a fifty-one year sentence.

After considering the evidence, the post-conviction court denied the Petitioner relief. In its order, the post-conviction court made the following findings and conclusions:

> The first allegation [in the post-conviction petition] is that [Counsel] gave erroneous advice to the Petitioner concerning [the] maximum sentence and lesser included offenses. [Counsel] testified that she advised the Petitioner correctly concerning minimum [and] maximum punishments and lesser included offenses. In one of the telephone calls, the Petitioner referred to voluntary manslaughter. The court accredits the testimony of [Counsel]. [Counsel] did state that she believes that [she] told the Petitioner's mother or grandmother fifty-one years, but she corrected that with the Petitioner on her next meeting with him. There was no evidence presented that the Petitioner was not aware of the correct minimum/maximum punishment at the time of the plea. . . . .

> The second allegation is that [Counsel] rendered ineffective assistance of counsel after the entry of the plea. The Petitioner never informed [Counsel] that he desired to withdraw his guilty plea. This court will not use

10

"word games" as alleged by the Petitioner. This allegation is completely erroneous.

The third allegation is to allege that no motions were filed. There was no showing that there were any motions that needed to be filed. [Counsel] had the discovery. There was no evidence presented in the hearing of this case that demonstrated that there was any evidence that could have been suppressed. This claim is likewise completely without merit.

The fourth allegation is that [Counsel] failed to adequately communicate with the Petitioner. There was no evidence presented that [Counsel] needed to meet with the Petitioner any more than she did. She adequately met with him. It was his decision not to go to trial. Based on the [post-conviction] hearing [testimony], that was a very intelligent decision by the Petitioner.

The fifth allegation is that [Counsel] did not consider the excessive notes that the Petitioner made. There was no showing at the hearing that these notes existed. From the testimony and the telephone calls, it is clear that [Counsel] did discuss the theory of the case and particularly the inconsistencies in the state's case. There was no showing that [Counsel] was not adequately prepared for trial.

The sixth allegation is that [Counsel] failed to properly investigate the case by failing to contact witnesses. Jaquita Murray testified at the post conviction hearing. Ms. Murray did not desire to talk with [Counsel]. There is nothing [Counsel] could do to force her to talk with her.

The seventh allegation is that [Counsel] was not prepared to try the case. The Petitioner has failed to establish through sworn testimony at the hearing that she was not prepared to try the case. The Petitioner in his telephone calls had been discussing the theory of the defense. Everyone in the jail knows that telephone calls are recorded and prosecutors listen to those calls. The Petitioner believed apparently that he could avoid that by using another defendant's pin number. The Petitioner sabotaged his own defense.

. . . .

In the amended [p]etition, it is alleged that [Counsel] was ineffective for failing to interview Jaquita Murray, Michael Taylor, Jumain Thompson

11

and Lionel Watkins. Only Ms. Murray testified; therefore, the court is unable to determine what information, if any, the other three individuals might have had.

. . . .

The . . . allegation concerns a polygraph. There is absolutely no evidence that [Counsel] informed the state anything about a polygraph. The Petitioner informed the state by talking with his mother about a polygraph. [Counsel] can not be faulted with the Petitioner's disclosing information knowing that his telephone calls were being monitored.

The [next] allegation is the state's offer to allow the Petitioner to withdraw his guilty plea. [Counsel] communicated that to the Petitioner. The Petitioner determined he wanted to think about it. The Petitioner did think about it and determined again not to withdraw his pleas. "A light skinned person" and a "white person" are not that different. One does not exclude the other. Ms. Murray had no difficulty in identifying the Petitioner.

The post-conviction court further concluded:

This court finds that [Counsel] provided more than adequate representation to the Petitioner and provided him very sound advice based on the expected testimony. The Petitioner failed to show prejudice that but for [Counsel's] errors, he would not have pleaded guilty. The court has not and can not find any errors by [Counsel] that she did not correct. The Petitioner's testimony is incredible. The court accepts the testimony of [Counsel].

It is from this judgment that the Petitioner now appeals.

**II. Analysis**

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because: (1) Counsel was ineffective in her preparation, communication, and advice to the Petitioner, causing him to plead guilty rather than proceed to trial; and (2) Counsel failed to advise and communicate with the Petitioner about the State's offer to withdraw his plea, but for which he would have withdrawn his plea. The Petitioner further contends that the post-conviction court erred when it denied his request to withdraw his plea because the evidence showed that the State committed a *Brady* violation and, therefore, the Petitioner's plea was not knowingly, voluntarily, and intelligently made. The State responds

12

that the post-conviction court properly determined that the Petitioner had failed to show by clear and convincing evidence that he received the ineffective assistance of counsel. The State further responds that the Petitioner has failed to prove a *Brady* violation because he has failed to demonstrate that the security guard's statement was material. We agree with the State.

## A. Ineffective Assistance of Counsel

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

13

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). To demonstrate prejudice in the guilty plea context, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, he would not have pleaded guilty and would have insisted on going to trial. *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011).

In the matter at hand, the post-conviction court accredited Counsel's testimony and

14

found that the Petitioner was not credible. The post-conviction court concluded that Counsel "adequately" communicated and met with the Petitioner. The post-conviction court found that Counsel was prepared to go to trial, had done adequate preparation, and that the decision to plead guilty rather than proceed to trial was made by the Petitioner. The post-conviction court further found that it was the Petitioner, through his recorded telephone calls, that "sabotaged" his theory of defense at trial. Finally, the post-conviction court concluded that it was the Petitioner's decision not to withdraw his plea and that Counsel communicated with him effectively on that issue. The post-conviction court found that the Petitioner's allegation in regard to the withdrawal of his plea was "completely erroneous."

We conclude that the evidence does not preponderate against the post-conviction court's findings. Counsel testified that she was prepared for trial and believed that the Petitioner was not guilty of the crime. However, as the post-conviction court noted, the Petitioner faced a possible lengthy sentence of more than twenty-five years and up to thirty-seven years if he was found guilty at trial. Counsel testified that he decided to plead guilty to avoid the possibility of a lengthy incarceration in exchange for the minimum sentence, fifteen years, for second degree murder. Counsel further testified that she gave the Petitioner advice about whether to withdraw his guilty plea and he ultimately declined the State's offer. The post-conviction court accredited Counsel's testimony, thereby resolving all factual issues raised by the evidence. *See Momon*, 18 S.W.3d at 156. We conclude that the Petitioner has failed to meet his burden of showing by clear and convincing evidence that Counsel was ineffective. He is not entitled to relief on this issue.

### B. Guilty Plea

The Petitioner contends that "the trial court erred in failing to permit withdrawal of [the] Petitioner's plea even absent a finding of ineffective assistance of counsel, as the evidence showed that the prosecution withheld evidence in violation of *Brady v. Maryland*, [373 U.S. 83 (1963)], and [the] Petitioner's plea was not knowing, voluntary, and intelligent." The State responds that the Petitioner has failed to prove a *Brady* violation because he has not demonstrated that the evidence withheld was material, and he cannot demonstrate a "reasonable probability" that the results of his proceeding would have been different had it been disclosed.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815

15

S.W.2d 534, 542 (Tenn. Crim. App. 1990). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). A petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Two days after the Petitioner entered his guilty plea, the State admitted that it had failed to disclose a statement made by the club security guard that the shooter was not white but "light skinned." Based on its withholding of the potentially exculpatory evidence, the State offered to allow the Petitioner to withdraw his guilty plea. Counsel informed the Petitioner of the State's offer, and, after discussing it with Counsel and his family, the Petitioner decided not to withdraw his plea. Any *Brady* violation committed by the State was remedied by its subsequent offer to the Petitioner.

As to his contention that he should be allowed to withdraw his plea because it was entered involuntarily, we reiterate that the Petitioner was given the opportunity to do so. The post-conviction court found that the Petitioner did not tell Counsel that he wanted to withdraw his plea. Counsel testified that she would have withdrawn the Petitioner's plea if he had requested her to do so, or if had she erroneously relied on his mother's information that he wanted to withdraw his plea, she would have gone to the judge and said the same. Counsel testified that the Petitioner signed a document saying he did not want to withdraw his plea. The post-conviction court accredited Counsel's testimony.

Based upon our review of the record, we conclude the Petitioner received the effective assistance of counsel and knowingly and voluntarily entered his plea. We further conclude that it was the Petitioner's decision not to withdraw his plea. We affirm the judgment of the post-conviction court. The Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. We further conclude that the Petitioner is not entitled to withdraw his guilty plea. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

16